United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ARTHUR CAIN,

          Plaintiff,

   v.

NANCY A. BERRYHILL,

          Defendant.

Case No. 18-cv-06376-DMR

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 15, 23

      Plaintiff Arthur Lee Cain moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found Cain not disabled and therefore denied his application for benefits under Title XVI of the Social Security Act, 42 U.S.C. § 401 et seq. [Docket No. 15.] The Commissioner cross-moves to affirm. [Docket No. 23.] For the reasons stated below, the court denies Cain's motion and grants the Commissioner's motion.

## I.  BACKGROUND

      Cain filed an application for Supplemental Security Income ("SSI") benefits on February 20, 2014, alleging disability beginning January 1, 1999. Administrative Record ("AR") 177-198. He later amended his alleged onset date of disability to the date of his application, February 20, 2014. A.R. 296-303. An Administrative Law Judge ("ALJ") held a hearing and issued an unfavorable decision on March 1, 2017. AR 15-25. The ALJ found that Cain has the following severe impairments: antisocial personality disorder; substance-induced psychotic disorder; depressive disorder not otherwise specified (NOS); adjustment disorder NOS; and methamphetamine dependence. A.R. 18. The ALJ concluded that Cain's impairments meet listings 12.04, 12.06, and 12.08, but that in the absence of substance use, he would not have an impairment or combination of impairments that met or medically equaled one of the listed

impairments.  A.R. 18-19.  The ALJ then determined that in the absence of substance use, Cain would have the residual functional capacity ("RFC") "to perform work at all levels of exertion . . . except he would be limited to simple work with limited contact with the public in jobs that do not require teamwork."  A.R. 20.  The ALJ concluded that Cain is not disabled because in the absence of substance abuse, he is capable of performing jobs that exist in the significant numbers in the national economy, including cleaner, harvest worker, and laundry worker.  AR 24-25.

After the Appeals Council denied review, Cain sought review in this court.  [Docket No. 1.]

## II.      ISSUES FOR REVIEW

1.  Did the ALJ err in assessing the materiality of Plaintiff's substance use?

2.  Did the ALJ err in weighing the medical evidence?

3.  Did the ALJ err in evaluating Plaintiff's credibility?

## III.     STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the district court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a mere scintilla, but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted).  When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was

inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## IV. DISCUSSION

Cain argues that the ALJ committed numerous errors. He asserts that the ALJ erred in determining that drug use was a contributing factor material to the determination of disability. He also argues that the ALJ erred in evaluating the medical opinions and in making a credibility determination. Because the ALJ's weighing of the medical evidence and adverse credibility determination formed the basis for his other findings, the court begins its analysis there.

### A. Weighing of the Medical Opinions

#### 1. Legal Standard

Courts employ a hierarchy of deference to medical opinions based on the relation of the doctor to the patient. Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("non-examining physicians"). *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion. *Id*.

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities. *Reddick*, 157 F.3d at 722. A treating physician's opinion, while entitled to more weight, is not necessarily conclusive. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). To reject the opinion of an uncontradicted treating physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion. *Lester*, 81

3

F.3d at 830. The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). This same standard applies to the rejection of an examining physician's opinion as well. *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant). An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa*, 143 F.3d at 1244. An opinion that is more consistent with the record as a whole generally carries more persuasiveness. *See* 20 C.F.R. § 416.927(c)(4).

### 2. Analysis

Cain argues that the ALJ erred by accepting the opinions of non-examining medical expert ("ME") Marian F. Martin, Ph.D., and by not giving sufficient weight to the opinions of examining physician Lesleigh Franklin, Ph.D. (who supervised the examination performed by Dionne Childs, M.S.) and Bob Kennedy, Psy.D.

### a. Childs/Franklin Opinion

Childs, supervised by Dr. Franklin, examined Cain on December 22, 2016, two days after the hearing before the ALJ. A.R. 1050-1058. She conducted a clinical interview, administered psychological exams, and reviewed Cain's records. A.R. 1050. Childs noted that Cain reported that he was currently clean of substance use, and that he stated that he has used drugs and alcohol to "cope with mental health symptoms." He also reported using drugs while homeless "so that he could stay awake and stay safe." A.R. 1051. Cain reported that "he feels he can read minds and

predict others' behavior," and that others can read his mind. According to Cain, he "is sometimes 'up for days taking care of other people' through his mind reading and telepathic reception of information from them." A.R. 1051. He also reported feeling "controlled by Asians and Whites for the past year and a half" and that he talks to himself regardless of whether he is using drugs, but also "suggested that [mindreading] intensifies with alcohol and drug use." A.R. 1052. According to Cain, his "mental health symptoms continue in the absence of substance use," and he continues to receive messages from mindreading. A.R. 1052.

Cain's speech was normal and he was talkative. A.R. 1052. His disposition was "pleasant and respectful" and he was engaging. His affect was appropriate, and his mood was anxious and depressed. He reported hallucinations and delusions but not suicidal ideation. Based on Childs's behavioral observations, she wrote that the reported assessment appeared to be a valid representation of his psychological and cognitive functioning. A.R. 1053.

Childs administered testing of Cain's intellectual functioning. He scored in the "well below average" range on perceptual reasoning, working memory, and full scale intelligence, with a full scale IQ of 73. However, his processing speed was in the average range. A.R. 1053-54. As to neuropsychological functioning testing, Cain scored in the "low average" range on the language range, and in the "extremely low" range on visuospatial/constructional abilities and immediate memory. He scored in the "well below average" range for delayed memory and attention and concentration and showed impaired performance on measures of executive functioning. A.R. 1054-55.

As to Cain's emotional functioning, Childs concluded that Cain "displays an impairment of general mental abilities," and noted a documented "history of problematic substance use patterns that have led to psychosis and incarcerations." A.R. 1055. She diagnosed unspecified schizophrenia spectrum disorder, other substance use disorder, unspecified bipolar and related disorder, unspecified trauma-related disorder, and borderline intellectual functioning. A.R. 1056.

Childs wrote that Cain's "history of substance use issues has a large impact on her [sic] mental health functioning," but noted that "the degree of this impact is challenging to determine." However, according to Childs, Cain "continues to experience severe mental health symptoms in

the absence of substance use when symptoms are not reduced by psychotropic medications." She further opined that Cain "has intellectual and neuropsychological impairments that might be roadblocks to his ability to maintain employment." A.R. 1056. She noted that there was no evidence that Cain had used substances on the day of his evaluation "and no evidence that he was exaggerating his symptoms for personal gain." A.R. 1057. She assessed the following limitations: marked impairments in the ability to understand, remember and carry out detailed instructions, respond appropriately to changes in a routine work setting and deal with normal work stressors, and complete a normal workday and workweek without interruptions from psychologically based symptoms. A.R. 1058.

The Childs/Franklin assessment was contradicted by the opinion of ME Martin, who opined that in the absence of substance use and with the use of medication, Cain would be only moderately limited in concentration, persistence, and pace and social functioning, and would be able to perform simple work with limited contact with coworkers and the public. A.R. 56. Accordingly, the ALJ was required to provide "specific and legitimate reasons" supported by substantial evidence to discount the Childs/Franklin opinion. *See Lester*, 81 F.3d at 830-31.

The ALJ assigned "some weight" to Childs's assessment, discounting her opinion because it appeared she "may have been misled by the claimant's willful behavior," and because he found that there was no reason to believe that Cain's reported symptoms would persist for 12 consecutive months if Cain abstained from drugs and alcohol and received treatment and support. A.R. 23. The court concludes that the ALJ did not err with respect to the weight afforded to the Childs/Franklin opinion. First, as to the ALJ's finding that Cain may have misled Childs, the ALJ pointed out that Cain reported symptoms that he had never mentioned previously, such as the assertion that he can read other people's minds. A.R. 23. Cain also stated for the first time that he can receive information telepathically and heal others, as well as his feeling that he had "been controlled by Asians and Whites for the past year and a half." A.R. 1051-52. While Cain once mentioned to a provider that he "think[s] [he] know[s] things before they happen," A.R. 640, the record contains no other references to Cain reading minds, receiving information telepathically, or being "controlled" by others. Moreover, Cain himself suggested that these symptoms intensify

with substance use. A.R. 1052. Additionally, Cain told Childs that he experiences hallucinations and delusions even when he is not using drugs and taking medications, A.R. 1052, 1056, but this is inconsistent with other representations to providers. *See*, e.g., A.R. 397, 398 (11/8/13 evaluation in which Cain stated he "has not had any difficulty with hallucinations since taking [medication]" and attributed his auditory hallucinations to "extensive drug abuse"); 410 (2/14/08 evaluation in which Cain reports that medications "prevent him from experiencing A/H and V/H's and paranoia"); 560 (8/18/16 reporting he is "feeling better with medications" and "has not been experiencing hallucinations").

The ALJ also questioned the results of Childs's testing, noting that even though Cain scored in the "well below average" range on intellectual functioning, with a full scale IQ of 73, "no other evaluator or observer noted any lack of understanding, comprehension, or intelligence." A.R. 23. In support, he cited a November 2013 evaluation of Cain by F. Biffi, L.C.S.W. when he was on parole. *See* A.R. 394-400. Biffi described Cain in that evaluation as speaking with "rapidity, clarity and organization," noted that "[h]is concentration was sufficient to the extent that he followed basic instructions," and "exhibited fair long-term memory by recalling personal and historic information," with an average general fund of knowledge that was consistent with his educational level. A.R. 396. The ALJ noted that Childs's testing "may have been compromised by [Cain's] willful behavior in seeking benefits, as he did at John George before." A.R. 23. The event to which the ALJ referred was Cain's April 2014 hospitalization in which he admitted that he was pretending to have psychotic symptoms in order to get food and a place to sleep, and asked if he could stay longer at the hospital if he told the doctor he was suicidal. A.R. 550.

The ALJ further discounted the Childs/Franklin opinion on the ground that even if the assessment of Cain's functioning was correct, "there is no reason to believe that those symptoms would persist at that level for a period of 12 consecutive months with abstinence from substance abuse and the additional treatment and support in his sober living environment." A.R. 23. Importantly, Childs herself noted that the degree of impact of Cain's substance abuse on his mental health functioning "is challenging to determine," A.R. 1056, and she did not offer an opinion about whether Cain's symptoms would be disabling for 12 consecutive months if he

continued to abstain from drugs and alcohol and received treatment.

In sum, the court concludes that the ALJ provided specific and legitimate reasons supported by substantial evidence to discount the Childs/Franklin opinion.

### b.  Kennedy's Opinion

The record contains three "Mental Health Clinician's Confidential Reports" completed by Dr. Kennedy in 2013, 2014, and 2016 for the purpose of certifying Cain's eligibility for county benefits. A.R. 441-46. Each form appears to be based on a single examination of Cain during the relevant year and none contains a narrative or discussion of Cain's functioning. Instead, they are check-off forms that contain diagnoses and ratings of the degree of Cain's limitations in 14 areas. On each of the three forms, Dr. Kennedy indicated that Cain is unable to work due to his mental health condition, that his condition has existed for 12 months or more, and that his condition will continue for 12 months or more. A.R. 442, 444, 446. In 2013 and 2014, he diagnosed Cain with paranoid schizophrenia; in 2016, he added the diagnoses of meth dependence, in remission, and ADHD. A.R. 442, 444, 446. Notably, in 2013 and 2014, Dr. Kennedy checked "no" in response to questions about whether Cain was an alcoholic, recovering alcoholic, drug abuser, and recovering drug abuser. A.R. 444, 446. In 2016, Dr. Kennedy indicated that Cain was a recovering drug abuser. A.R. 442.

The ALJ assigned Dr. Kennedy's opinions "very little weight" for several reasons: "they are unsupported, they do not contain enough information, they fail to consider the effects of the substance abuse, and they are not consistent with the overall longitudinal record indicating that in the absence of substance abuse, the claimant is not disabled." A.R. 22. The court concludes that the ALJ did not err with respect to Dr. Kennedy's opinions. The record supports an inference that Dr. Kennedy was not aware of Cain's persistent and ongoing drug and alcohol addiction until 2016, and even then, he was under the impression that Cain had stopped using drugs since he indicated that Cain was a "recovering drug abuser." However, the record contains substantial evidence of Cain's ongoing drug and alcohol addiction through 2016. *See, e.g.*, 405 (3/18/14, positive for methamphetamines), 416 (11/1/12, Cain "described psychotic [symptoms] often occur when under the influence," and "has extensive [history] of meth and cocaine use"), 426 (11/24/14,

8

used meth 2 months ago), 464 (7/2/16 hospitalization, Cain admitted to using meth and had been acutely intoxicated), 492 (5/2/15 hospitalization, under the influence of amphetamines and ecstasy), 514-530 (11/21/14 hospitalization with numerous references to having arrived intoxicated), 550 (4/12/14 hospitalization, upon arrival stated he was "high on meth"), 902 (4/21/15, admitted using alcohol "daily"), 928, 8/4/15, admitted daily use of amphetamines and cocaine), 983 (2/19/16, positive tox screen for amphetamines and cocaine). This fact alone, that Dr. Kennedy was unaware of Cain's substance abuse at the time of the evaluations and thus failed to consider the effects of the substance abuse on his functioning, is a specific and legitimate reason supported by substantial evidence to give his opinion "very little weight." The court finds no error with respect to Dr. Kennedy's opinion.

### c.    Martin's Opinion

Nonexamining ME Dr. Martin testified at the hearing. She discussed her review of the record and Cain's diagnoses and summarized her review as follows:

> [I]t looks as if when Mr. Cain is incarcerated, and taking his medication, and presumably not using substances, most of the records, at that time, indicate that he denies having psychotic symptoms. . . . [w]hen he is not incarcerated, and he ends up with legal or other difficulties, and ends up back in jail or in—perhaps in the hospital, those are times when he apparently goes off his medications for some period of time, and is using substances. He doesn't seem to have the psychotic symptoms—significant psychotic symptoms when he's on his meds and when he's not using substances.

A.R. 55.

The ALJ asked her if it was "possible to tease out two separate medical source statements," one in the absence of substance abuse, and one in the presence of substance abuse. She testified that she "believe[s] it is possible to separate those out," because Cain "seems to be doing quite well when he is incarcerated and presumably not using substances." A.R. 55. Dr. Martin opined that when Cain is using substances, he has moderate to marked limitations in social functioning, marked limitations in concentration, persistence and pace, and moderate limitations in activities of daily living. However, in the absence of substance abuse and with medication, Cain is only moderately limited in social functioning and concentration, persistence and pace, and only mildly limited in activities of daily living. A.R. 56. Therefore, she testified, he would be able to perform

9

"simple work with limited contact with co-workers and the public." A.R. 56.

In response to questioning from Cain's attorney, Dr. Martin testified that the fact that Cain does well when he is not using substances and is taking medication does not indicate a need for a highly supportive living environment. Instead, according to Dr. Martin, it indicates "a need for very extended substance abuse treatment . . . and therapy." A.R. 59. She also stated her belief that Cain's substance abuse contributes to the onset of his psychiatric symptoms, noting that Cain's symptoms of paranoia, auditory and visual hallucinations, and discomfort around people "are very classic symptoms . . . of meth abuse." A.R. 59. When asked if she could "clearly say whether [the symptoms are] because he is not on his meds or because he is using drugs," she initially responded, "[e]ither or," and then stated, "I think the primary issue is because he's using drugs. The medication, a lot of times really, are, I believe, prescribed to control or manage the psychotic symptoms that result from the drug use." A.R. 60.

The ALJ assigned Dr. Martin's opinions "the greatest weight." He cited the following reasons for doing so: 1) "her opinion is consistent with the record, including the mental status examinations, the claimant's statements, and the treatment records"; 2) "her opinion demonstrated a good understanding of the Social Security program requirements," and 3) "she is the only qualified professional who had the advantage of a review of the entire record, which gives her a perspective not available to the individual evaluators." A.R. 23. The ALJ's acceptance of and reliance on Dr. Martin's opinions is critical, because the issue of whether Cain would be disabled in the absence of his drug and alcohol abuse is dispositive, as discussed in the last section of this opinion.

The court finds that substantial evidence supports the ALJ's assignment of "the greatest weight" to Dr. Martin's opinions. The ALJ noted that the records supported Dr. Martin's testimony that Cain "generally functioned without psychotic symptoms while incarcerated and presumably not using drugs, but reported psychotic symptoms when out of prison or jail and using methamphetamine," A.R. 21, and then discussed the record evidence that he found supported her opinion. A.R. 21-23. The ALJ first discussed the November 2013 evaluation by L.C.S.W. Biffi, which took place two months after his release from incarceration and three months before his

February 2014 alleged onset date, in which Cain was described as "doing wel[l]" with "[n]o problems reported." Cain was described as pleasant and cooperative, and "spoke with rapidity, clarity and organization." He "appeared calm and he exhibited no unusual behaviors or mannerisms," and "[n]o delusions, obsessions or phobia were evident." There was also "no indication of a perceptual disorder of psychotic proportion." *See* A.R. 21 (discussing A.R. 393). The ALJ also noted that on April 8, 2013, shortly before an April 20, 2013 release date from incarceration, Cain was described as alert, cooperative, polite, proactive, and appropriate. A.R. 21 (discussing A.R. 344). *See also* A.R. 345 (Apr. 18, 2013 treatment note that Cain presented with an affect within normal limits, had linear thought process, and appeared stable; "Client appears ready to be released, and eager to get on with his life.").

The ALJ also discussed the April 2014 hospitalization during a period when Cain was not incarcerated. Upon his arrival, Cain "stated he was high on meth," but stabilized after staying at the hospital overnight. A.R. 550. Dr. Punwani wrote that Cain admitted that he was pretending to have psychotic symptoms in order to get food and a bed at the hospital. At discharge, she wrote, "[n]o psychiatric symptoms. Not a danger to self or others. Can be discharged." A.R. 550. The ALJ concluded that "the episode does not represent an exacerbation of his psychological symptoms, but instead appears to represent a manipulation of the system to obtain food and shelter." A.R. 22.

The ALJ discussed a November 25, 2014 assessment, during which Cain said that he "can't live outside of jail," and described auditory and visual hallucinations. A.R. 22 (discussing A.R. 425-27). In that assessment, Cain reported last using methamphetamines two months prior and cocaine two years prior and was prescribed Zyprexa and referred to substance abuse counseling. A.R. 426-27. Notably, just four days prior to this assessment, on November 21, 2014, Cain had been placed on a psychiatric hold after "bizarre" and "aggressive" behavior and a determination that he was a danger to himself. A.R. 515. Cain was growling and stomping his feet with clenched fists. A.R. 522. While the intake records indicate that Cain tested negative for the presence of benzodiazepines, the records of his stay contain at least five references to his intoxication or inebriation. *See* A.R. 514, 515, 517, 522, 527, 530.

Further, the ALJ discussed evidence from Alameda County Behavioral Health/Santa Rita Jail that Cain submitted after the hearing. A.R. 22 (citing Exhibit 10F). As discussed by the ALJ, the records showed that upon his incarceration beginning on July 3, 2016, he was "irritable" and "difficult," and reported that he had last used methamphetamines and alcohol one week prior. *See* A.R. 570 ("Deputies report that he has been highly agitated since coming into custody and difficult to contain."), 572. The provider noted that his "[p]resentation upon coming into custody is likely substance induced." However, just over two weeks later, when it was reasonable to infer that he had not used substances in two to three weeks, a provider described him as "properly groomed, affect relaxed, alert and well oriented, speech normal and coherent, thought process logical and goal directed, behavior cooperative." A.R. 575. The ALJ concluded that this evidence "supports Dr. Martin's conclusions that when under the influence, the claimant exhibits serious and likely disabling symptoms, but when abstinent, he regains the ability to perform activity at least as described in the [RFC]." A.R. 22.

Additional record evidence supports the ALJ's reliance on Dr. Martin's conclusion that Cain exhibits "serious and likely disabling symptoms" when he is using substances, but during periods of incarceration, when Cain is presumably not using substances, his mental health symptoms improve to the extent that he would be able to perform activity consistent with the RFC. *See* A.R. 22. For example, the record contains evidence of three involuntary psychiatric holds, in addition to the two already discussed above. Each was connected to Cain's substance use. First, on May 2, 2015, Cain was hospitalized after creating a public disturbance. A.R. 493. He was experiencing auditory and visual hallucinations and "yelling at people that weren't there," and tested positive for methamphetamines. A.R. 505, 506, 508. A treatment provider wrote that after detoxing, Cain denied hallucinations and delusions and was organized and cooperative, with euthymic mood and appropriate affect. A.R. 508. He was diagnosed with amphetamine intoxication delirium and amphetamine abuse. A.R. 509.

Cain was next hospitalized on January 26, 2016, complaining of "hallucinational, delusional problems" and needing rest. A.R. 469 ("I just need to get some rest. I just been up too long trying to stay warm."). He admitted to using alcohol "a week ago," and using

methamphetamines and cocaine a "couple of weeks or months ago," A.R. 472, but he tested positive for cocaine and alcohol use. A.R. 485. He was diagnosed with adjustment disorder unspecified. A.R. 487. He was also hospitalized on July 2, 2016 after another public disturbance that included trying to break into a business. A.R. 450. A provider wrote that Cain was "off his meds and can't understand why he is here." A.R. 451. He initially refused to give urine for a utox and was uncooperative with a psychiatrist. A.R. 462. He subsequently became "directable" and was described as "behaving appropriately." He denied hallucinations and delusions and "[a]dmitted to using meth," and a provider described him as "acutely intoxicated" when he arrived. A.R. 464. A provider diagnosed unspecified amphetamine or other stimulant-related disorder. A.R. 463. At intake, a provider wrote that he had "several prior JGPP visits," with the last in January 2016, that were usually related to "substance intoxication," with discharge within 24-48 hours. The same provider wrote, "Suspected contigent si [sic] in the past for food/shelter." A.R. 462.

In contrast, mental status examinations performed when Cain was incarcerated and not using substances were frequently unremarkable and showed Cain to be functioning well and without any notable symptoms. This includes observations that Cain was stable when taking his medications and was even "high functioning." *See*, *e.g*., A.R. 326 (6/19/10, noting cooperative demeanor, no auditory hallucinations, clear cognition and coherent speech), 331 (10/13/10, reports symptoms controlled with medications, appears "high functioning and stable"), 334 (10/4/10, reports all symptoms are currently managed by medications, changing level of care due to improved level of functioning); 335 (7/15/10, noting "stable managed with meds" for each issue; no drug use for six months); 640 (4/8/09, orientation, speech, affect, mood, thought processes all within normal limits), 647 (10/4/10, noting "minimal acute factors" and reducing level of care "[d]ue to reductions in symptoms and stability due to meds"), 678 (2/11/09, "making significant progress . . . . is medication compliance [sic] and this appears to be a large factor in his ability to concentrate and focus on his [treatment] at this time"), 686 (2/9/09 ("[h]e does not report any A/H or V/H since his medication appears to help him with these past symptoms (as well as not abusing alcohol or meth while in the system).")). Other evidence shows that upon initial periods of

13

incarceration, Cain appeared to struggle with symptoms such as hallucinations that providers attributed to substance abuse, but that his condition improved with medication. *See, e.g.*, A.R. 708 (11/21/08, following 11/20/08 arrival at San Quentin, described as having auditory hallucinations and diagnosed with substance-induced psychotic disorder), 719 (11/21/08, "hallucinations, delusions appear as a result of extensive substance abuse"), 721 (11/24/08, "refers to hearing voices with a delusional interpretation"), 722 (11/25/08, "states that he slept well with med change, that he's feeling more settled . . . reports feeling more in control, with voices settling"). For example, Cain was admitted to county jail on April 13, 2015. He stated he "doesn't need his meds" and would not allow a blood pressure check; he "just look[ed] down [at] the floor and h[e]ld his head, remain[ed] mute afterwards." A.R. 893. He was placed in a sobering cell. A.R. 902. The following day, a provider wrote that he had refused to cooperate at processing and resisted deputies. The provider further noted that it was unclear whether Cain was intoxicated or detoxing at that time. A.R. 894. Later that same day, Cain apologized to the same provider, "I'm sorry you had to see me like that. . . . I'll be cooperative." A.R. 896. Cain was subsequently released and then re-arrested at the beginning of May 2015. On June 12, 2015, a provider at County Jail 4 observed that Cain showed no indications of distress and was "future-oriented" and optimistic. The provider also noted that "[t]hough stimulants have been his drug of choice, he looks robust," while noting that the fact that he had been incarcerated since May 7, 2015 "may at least partially explain that." A.R. 913.

There are records from periods of incarceration in 2015 at County Jail 5 that indicate that Cain complained to providers about "hallucinations and delusions" and requested medication. *See*, e.g., A.R. 928 (8/4/15), 932 (8/10/15), 938 (9/7/15). However, providers observed that he displayed no objective signs of "responding to internal stimuli" or mental illness and no disturbances in his thought processes. A.R. 932, 938, 944. One provider wrote, "it appears when client experiences situational stressors he engages in disturbing internal dialogue, which he terms 'voices'," but that he showed "[n]o signs of psychotic process." A.R. 944. However, one month later, it appears that Cain stabilized and no longer complained of auditory or visual hallucinations. Instead, he expressed anxiety about his upcoming release from jail. A.R. 953, 956, 959, 962.

Cain was released from custody on December 29, 2015 after a six-month period of incarceration, and then re-arrested one day later, on December 30, 2015, admitting to having used alcohol prior to his arrest. A.R. 969. The provider at County Jail 1 noted that he had been arrested with methamphetamines on his person. A.R. 969. Following that arrest, the records indicate that Cain asked for medication and therapy but denied experiencing hallucinations. A.R. 975, 976. A provider found him "mostly unreliable" with "highly suspect" motivations. A.R. 976.

In sum, there is substantial record evidence supporting the ALJ's decision to assign great weight to Dr. Martin's opinions on the ground that it was consistent with the record, including mental status examinations, Cain's statements, and the treatment records. A.R. 23.

The ALJ also explained that Dr. Martin's "opinion demonstrated a good understanding of the Social Security program requirements," and that "she is the only qualified professional who had the advantage of a review of the entire record, which gives her a perspective not available to the individual evaluators." A.R. 23. Cain argues that both of these reasons are insufficient. He first notes that in response to his attorney's question to Dr. Martin about her familiarity with Social Security Ruling 13-2p, which sets forth the procedure for evaluating cases involving drug and alcohol abuse, Dr. Martin testified "I don't know what that is." A.R. 66. Her testimony does not entirely negate the ALJ's observation of her understanding of Social Security program requirements; she demonstrated familiarity with the record, testified at length about whether Cain met various listings, and provided opinion evidence about Cain's functioning in both the presence and absence of substance abuse. *See* A.R. 51-57.

Cain also notes that the observation that Dr. Martin had reviewed the entire record was incorrect, as she testified that she had reviewed exhibits 1F through 14F, A.R. 51, but Cain submitted additional medical evidence following the hearing, including the Childs/Franklin opinion. *See* A.R. 601-1058. Notably, other than the Childs/Franklin opinion, Cain does not highlight any specific evidence in the supplemental medical evidence that he claims would have been material to Dr. Martin's analysis. Moreover, the ALJ discussed the evidence and found that it "supports Dr. Martin's conclusions that when under the influence, the claimant exhibits serious and likely disabling symptoms, but when abstinent, he regains the ability to perform activity at

15

least as described in the residual functional capacity." A.R. 22. Therefore, while this reason for giving her opinion the greatest weight was technically incorrect, it does not actually undermine the ALJ's determination of the weight to be given to Dr. Martin's opinions. In sum, the ALJ did not err in assigning great weight to Dr. Martin's opinions, and significantly less weight to the Childs/Franklin and Kennedy opinions.

### B.    The Credibility Assessment

#### 1.    Legal Standard

In general, credibility determinations are the province of the ALJ. "It is the ALJ's role to resolve evidentiary conflicts. If there is more than one rational interpretation of the evidence, the ALJ's conclusion must be upheld." *Allen v. Sec'y of Health & Human Servs*., 726 F.2d 1470, 1473 (9th Cir. 1984) (citations omitted). An ALJ is not "required to believe every allegation of disabling pain" or other nonexertional impairment. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989) (citing 42 U.S.C. § 423(d)(5)(A)). However, if an ALJ discredits a claimant's subjective symptom testimony, the ALJ must articulate specific reasons for doing so. *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006). In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "must specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Id*. at 972 (quotations omitted); *see also Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (stating that an ALJ must articulate reasons that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony"). The ALJ may consider "ordinary techniques of credibility evaluation," including the claimant's reputation for truthfulness and inconsistencies in testimony, and may also consider a claimant's daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

The determination of whether or not to accept a claimant's testimony regarding subjective symptoms requires a two-step analysis. 20 C.F.R. §§ 404.1529, 416.929; *Smolen*, 80 F.3d at 1281 (citations omitted). First, the ALJ must determine whether or not there is a medically determinable impairment that reasonably could be expected to cause the claimant's symptoms. 20

C.F.R. §§ 404.1529(b), 416.929(b); *Smolen*, 80 F.3d at 1281-82. Once a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of" the symptoms. *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (en banc) (citation omitted). Absent affirmative evidence that the claimant is malingering, the ALJ must provide "specific, clear and convincing" reasons for rejecting the claimant's testimony. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The Ninth Circuit has reaffirmed the "specific, clear and convincing" standard applicable to review of an ALJ's decision to reject a claimant's testimony. *See Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014).

## 2. Analysis

Cain challenges the ALJ's credibility finding. The ALJ found that "[t]he treatment notes and the mental health evaluations establish that there are severe impairments that reasonably could result in symptoms described by the claimant," and concluded that Cain was "partially consistent" regarding his ability to function. A.R. 23-24; *see also* A.R. 21 ("the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the objective medical and other evidence for the reasons explained below."). Cain argues that the ALJ erred because he did not specify which statements he found to be consistent and which statements he found to be inconsistent. The court disagrees. Although the ALJ did not collect such statements in one section of his opinion, the opinion highlights numerous instances in the record in which Cain exaggerated or made inconsistent statements about his symptoms and functioning.

First, the ALJ noted that Cain was not candid about his work history at the hearing, as he initially denied that he had worked since late 2014 and then only admitted that he had worked weekends at a flea market in 2016 when the ALJ noted evidence of it in the record. A.R. 17; *see* A.R. 37-38. The ALJ also discussed the evidence of Cain's April 2014 hospitalization at a psychiatric facility. Manisha Punwani, M.D., wrote that "someone told him to go to [John George Psychiatric Pavilion, "JG"] and state he was [suicidal]," and that he "[l]augh[ed] and states he was

able to do it." A.R. 550. Dr. Punwani noted that Cain said to give him "food and a bed and leave me alone." She further noted that Cain had "[n]o psychiatric symptoms. Not a danger to self or others. Can be discharged." A.R. 550. Cain also denied suicidal or homicidal ideation, but the doctor's notes appear to indicate that he asked her, "if I say that I do have suicidal or homicidal ideation, can I stay longer?" A.R. 550. The ALJ found that "[t]his episode does not represent an exacerbation of his psychological symptoms, but instead appears to represent a manipulation of the system to obtain food and shelter." A.R. 22. In connection with a different hospitalization in January 2016, the doctor performing the intake evaluation articulated a suspicion that Cain was feigning symptoms in order to obtain food and shelter and noted the need to rule out malingering. A.R. 486-87.

Additionally, as discussed above in connection with his discussion of the Childs/Franklin opinion, the ALJ concluded that the testing "may have been compromised by [Cain's] willful behavior in seeking benefits," citing his April 2014 hospitalization. The ALJ also noted Cain's report that he can read other people's minds, a symptom that was "documented nowhere else in the record." A.R. 23. Further, he noted inconsistencies between the results of Childs's intelligence testing and a November 2013 assessment. A.R. 23.

At the December 2016 hearing, Cain stated that he had last used drugs and alcohol in July 2016, but admitted that a police report for an arrest a month and a half ago indicated that he was under the influence. A.R. 39. He also testified that he had last used cocaine in 2008, but the record contains evidence inconsistent with this representation. For example, in November 2014, Cain stated he last used cocaine "2 years ago," or in 2012. A.R. 426. In January 2016, he admitted using cocaine a "couple of weeks or months ago." A.R. 472. He admitted to "daily use" of cocaine and methamphetamine in August 2015, A.R. 928, and tested positive for cocaine in February 2016. A.R. 983.

In sum, given the record evidence casting some doubt on Cain's credibility, the ALJ did not err in concluding that Cain's statements about his ability to function were only "partially consistent."

## C.     The Drug Addiction and Alcoholism Analysis

Finally, Cain argues that the ALJ erred by finding that his substance use is a contributing factor material to the determination of disability.

### 1.     Legal Standard

When the record demonstrates that substance abuse has occurred in conjunction with an alleged disability, the ALJ may not find a claimant disabled "if alcoholism or drug addiction would . . . be a contributing factor material to the . . . determination that the individual is disabled." 42 U.S.C. § 1382c(a)(3)(J); *see* 20 C.F.R. § 416.935(a) & (b).  In determining whether a claimant's drug abuse and alcoholism ("DAA") is material, the test is whether the individual would still be found disabled if he or she stopped using drugs or alcohol.  *See* 20 C.F.R. §§ 404.1535(b), 416.935(b); *Parra v. Astrue,* 481 F.3d 742, 746-47 (9th Cir. 2007); *Sousa v. Callahan,* 143 F.3d 1240, 1245 (9th Cir. 1998).  The ALJ must "evaluate which of [the claimant's] current physical and mental limitations . . . would remain if [the claimant] stopped using drugs or alcohol and then determine whether any or all of [the claimant's] remaining limitations would be disabling." 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2).  If the ALJ determines that the claimant's remaining limitations are disabling, then the claimant's DAA is not a material contributing factor to the determination of disability, and the claimant is disabled, independent of his or her DAA.  *See* 20 C.F.R. §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii).  The claimant has the burden of showing that he or she would qualify as disabled absent DAA.  *See Parra*, 481 F.3d at 748.

Social Security Ruling ("SSR") 13-2p sets forth the procedure for evaluating cases involving DAA, which the ruling defines as "Substance Use Disorders; that is, Substance Dependence or Substance Abuse as defined in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) published by the American Psychiatric Association."  SSR 13-2p, 2013 WL 621536, at *3.  It instructs adjudicators to "apply the appropriate sequential evaluation process twice.  First, apply the sequential process to show how the claimant is disabled.  Then, apply the sequential evaluation process a second time to document materiality[.]"  *Id*. at *6.  Although SSRs do not have the force of law, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference

"unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

SSR 13–2p(7) provides that where a claimant has co-occurring mental disorder(s), there must be "evidence in the case record that establishes that [the] claimant . . . would not be disabled in the absence of DAA" to support a DAA materiality determination. SSR 13–2p(7), 2013 WL 621536, at *9. The ALJ may not "rely exclusively on medical expertise and the nature of a claimant's mental disorder" to support a finding of DAA materiality. *Id*.

### 2. Analysis

In this case, the ALJ found that Cain's impairments, including substance use disorder, meet the listings for affective disorders, anxiety and obsessive-compulsive disorders, and personality and impulse-control disorders (listings 12.04, 12.06, and 12.08). Relying on the testimony of Dr. Martin, he concluded that in the presence of substance abuse, Cain would have marked difficulties with the ability to concentrate, persist, or maintain pace, moderate to marked difficulties interacting with others, and moderate difficulties with understanding, remembering, or applying information and with adapting or managing oneself. A.R. 19. The ALJ then determined that in the absence of substance use, Cain's remaining limitations would not meet or medically equal the criteria of the three listings. In making that determination, he stated his reliance on Dr. Martin's testimony that many of Cain's symptoms, including paranoia and auditory and visual hallucinations, "are very classic symptoms" of methamphetamine abuse. A.R. 59. As previously quoted above, Dr. Martin testified that Cain's psychotic symptoms lessened when not using drugs and taking his medications. *See* A.R. 55. When asked for her opinion about whether Cain's episodes of decompensation were caused by substance abuse or failure to take medications, Dr. Martin stated, "I think the primary issue is because he's using drugs. The medication, a lot of times really, are, I believe, prescribed to control or manage the psychotic symptoms that result from the drug use." A.R. 60.

The ALJ stated that he "accept[ed] Dr. Martin's conclusions," and concluded that "based on her review of the medical evidence and taking into consideration the claimant's behavior while incarcerated and not using drugs and alcohol, along with the short periods of sobriety when not

incarcerated," the evidence supports a finding of only mild to moderate impairments in the absence of substance use. A.R. 19; *see also* A.R. 55. He then discussed the record evidence and explained the various weights he gave to the opinion evidence, and ultimately determined that Cain's "substance use disorder is a contributing factor material to the determination of disability because [Cain] would not be disabled in the absence of substance use." A.R. 25.

Cain argues that the ALJ erred in his analysis. He notes that in determining that Cain did not meet the criteria of the listings in the absence of DAA, the ALJ stated, "I accept Dr. Martin's conclusions." *See* A.R. 19. According to Cain, this statement indicates that the ALJ relied exclusively on Dr. Martin's expertise on the issue of materiality, in violation of SSR 13-2p. Not so. The ALJ did not rely solely on Dr. Martin's testimony in making the materiality determination; to the contrary, he considered and discussed other evidence in the record that supported his determination, including Cain's medical records and Cain's testimony, in addition to Dr. Martin's testimony. He also discussed evaluations by other providers. *See* A.R. 20-24. The court finds no error as to this issue.

Cain also argues that the ALJ should not have relied on evidence of Cain's improvement while incarcerated because prison is a "highly structured setting" within the meaning of SSR 13-2p:

> Improvement in a co-occurring mental disorder in a highly structured treatment setting, such as a hospital or substance abuse rehabilitation center, may be due at least in part to treatment for the co-occurring mental disorder, not (or not entirely) the cessation of substance use. We may find that DAA is not material depending on the extent to which the treatment for the non-occurring mental disorder improves the claimant's signs and symptoms. If the evidence in the case record does not demonstrate the separate effects of the treatment for DAA and for the co-occurring mental disorder(s), we will find that DAA is not material . . .

SSR13-2p, 2013 WL 621536, at *12. Cain essentially acknowledges that his symptoms significantly improved during periods of abstinence from drugs and alcohol—as the ALJ found in concluding that his DAA was material—but disagrees with the reason for the improvement. According to Cain, "[a]ny improvement in Plaintiff's psychotic and affective symptoms during his periods of incarceration *could* be attributed to medication maintenance, as well as the structure and

familiarity of institutional living," and not to abstaining from drugs and alcohol.  Pl.'s Mot. 17 (emphasis added).  However, the record contains evidence that Cain's psychotic symptoms often improved over the course of one or two days, or after he physically detoxed from substances.  *See*, *e.g.*, 464, 508, 550.  Additionally, Dr. Martin addressed this issue.  She testified that the fact that Cain does well when he is not using substances and is taking medication does not indicate a need for a highly supportive living environment.  Instead, she opined, it indicates "a need for very extended substance abuse treatment . . . and therapy."  A.R. 59.  She also stated her belief that Cain's substance abuse contributes to the onset of his psychiatric symptoms, noting that Cain's symptoms of paranoia, auditory and visual hallucinations, and discomfort around people "are very classic symptoms . . . of meth abuse."  A.R. 59.  When asked if she could "clearly say whether [the symptoms are] because he is not on his meds or because he is using drugs," she initially responded, "[e]ither or," and then stated, "I think the primary issue is because he's using drugs.  The medication, a lot of times really, are, I believe, prescribed to control or manage the psychotic symptoms that result from the drug use."  A.R. 60.  As discussed above, the ALJ did not err in giving her opinions the greatest weight.

Reasonable minds may differ on the issue of whether Cain's improvement during periods of incarceration was due to treatment for his mental disorders, and not the cessation of substance abuse.  But that is not the legal standard.  At issue is whether the ALJ's materiality determination is supported by substantial evidence and free from legal error.  The court concludes that it is.  *See Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld.").

## V.    CONCLUSION

For the foregoing reasons, the court grants the Commissioner's motion for summary judgment and denies Cain's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: February 4, 2020

_____
Donna M. Ryu
United States Magistrate Judge